UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUPPLIER'S CITY SA De, CV,

        Plaintiff,

v.

EFTEC NORTH AMERICA, LLC,

        Defendant.

_____/

Case No. 07-12694

Hon. Victoria A. Roberts

## ORDER

## I.      INTRODUCTION

This matter is before the Court on three motions:  Plaintiff's Evidentiary Objections to Defendant's Response to Plaintiff's Motion for Summary Judgment and Motion to Strike [Doc. 40], Defendant's Motion to Strike Plaintiff's Purported "Evidentiary Objections to Defendant's Response to Plaintiff's Motion for Summary Judgment and Motion to Strike" [Doc. 41], and Plaintiff's Motion for Partial Summary Judgment [Doc. 33].  For the reasons stated, the Court **GRANTS IN PART** and **DENIES IN PART**, Plaintiff's Objections and Motion to Strike; **DENIES** Defendant's Motion to Strike; and, **DENIES** Plaintiff's Motion for Partial Summary Judgment.

## II.     BACKGROUND

This is a breach of contract action between Plaintiff Supplier's City SA De, CV ("Supplier's City") and Defendant EFTEC North America, LLC ("EFTEC").  Supplier's City is a Mexican corporation located in Hermosillo, Mexico; it provides warehousing and storage services for American companies that operate "maquiladora" assembly

1

plants in Hermosillo. EFTEC is a Michigan limited liability company with locations in Taylor, Michigan and Dayton, Ohio; it manufactures coating and sealant products used by automobile manufacturers.

During the time period at issue, EFTEC sold a sealant called "PVC," and a water-based liquid applied sound deadening ("LASD") material to Ford Motor Company ("Ford"), for use at Ford's assembly plants, including Ford's maquiladora plant in Hermosillo. EFTEC's PVC and LASD products were transported in re-usable magna drums; the products could be stored in the drums for 60 to 90 days, then they were unusable.

Traditionally, EFTEC sold its products to Ford in Michigan. Ford, in turn, transported the products into Mexico. In early 2005, however, Ford requested that EFTEC transport and deliver the products into Mexico, and warehouse them near Ford's Hermosillo plant until they were needed. Several EFTEC employees investigated the related costs, including Account Representative, Clive Greenwald ("Greenwald"). Greenwald admits they did not account for any taxes or duties because they believed Ford's plant was a duty-free zone. Ultimately EFTEC submitted a bid to Ford, and agreed to handle the freight to, and warehousing of the products in, Mexico. As a consequence of this new arrangement with Ford, EFTEC sought the services of a Mexican-based transportation logistics vendor. Ford recommended Supplier's City.

In April or June 2005, EFTEC manager, Robert Revnew ("Revnew") briefly visited Supplier's City's Hermosillo warehouse to view the facilities for the first time. During that visit, Revnew met Supplier's City Commercial Director, Manuel Baker ("Baker"), who gave him a brochure describing the services offered by Supplier's City.

2

The brochure indicated that Supplier's City provided warehousing, transportation, customs brokerage, order management, inventory management and product visibility services. The brochure also indicated that "Supplier's City assumes total responsibility of your material/parts imports based on the 'Maquila de Servicios' permit." (A maquila de servicios permit allows for the temporary import of goods necessary for use in the manufacture, production and/or repair of products for export, without payment of certain Mexican taxes and duties). Revnew gave the brochure to Greenwald, who subsequently handled all discussions between the parties.

Greenwald visited Supplier's City's warehouse in the spring or summer of 2005, and negotiated an arrangement between the parties. Eventually, EFTEC and Supplier's City entered into an oral agreement for warehousing, at a cost of $8.00 per container; the exact date of the agreement is unknown. The oral agreement was later expanded to include customs brokerage and transportation of the products across the United States-Mexico border; it is unclear what fees were to be paid for these additional services. Supplier's City subcontracted with Corporative Aduanal Ruiz ("Ruiz"), a customs brokerage firm, to prepare the necessary border-crossing documentation. The date of this contract modification is also unknown.

None of these agreements was reduced to writing, which is the primary reason for this lawsuit. The parties disagree on the factual events surrounding the making and performance of the contract, and on most of the material contractual terms, but particularly whose obligation it was to pay what is known as the "VAT," a value added tax imposed by the Mexican government on raw materials, parts and machinery imported into Mexico on a permanent basis.

EFTEC says the agreement required Supplier's City to: (1) receive EFTEC's products at the United States border from EFTEC'S Logistics manager, ChemLogix, which hauled the products from EFTEC's plants in Michigan or Ohio; (2) broker the products across the border into Mexico and pay all applicable charges associated with the border crossing, including the VAT; (3) transport the products from the border to Hermosillo; (4) store the products in Supplier's City's warehouse facility in Hermosillo until needed by Ford; (5) load the products onto Ford's trucks when requested by Ford; (6) receive empty magna drums from Ford; (7) warehouse empty magna drums received from Ford; and (8) transport the empty drums back to the border or to EFTEC's facilities in Michigan or Ohio, once it had a full truckload of 24 empty magna drums.

EFTEC says they discussed the charges associated with border crossing, and that Supplier's City never advised EFTEC that the VAT could possibly be assessed by the Mexican government on EFTEC's products. EFTEC says Supplier's City claimed it qualified as a tax-free zone under the North American Free Trade Agreement ("NAFTA"), and VAT would not be charged on EFTEC'S products. EFTEC says it relied on Supplier's City expertise.

Supplier's City, on the other hand, says that EFTEC was to pay all related costs for Supplier's City's services, including any VAT, other taxes, or duties imposed. Supplier's City admits that it was to return empty magna drums to EFTEC, once it received a truckload of 24 empty drums from Ford. Supplier's City says it referred EFTEC to Ruiz for all border crossing issues, and Ruiz specifically advised EFTEC, that EFTEC had to pay the VAT. Supplier's City says that due to EFTEC's inexperience in international sales, it apparently neglected to include the VAT in the original price it

negotiated with Ford.

Supplier's City also argues there is a well-established general custom in the multinational importing, transporting and warehousing business:  VAT taxes are paid for by the importer, i.e., the owner of the product crossing the border.  Supplier's City says EFTEC knew of the custom, and the oral agreement was made with reference to this custom.

Ruiz claims it told EFTEC that if EFTEC was not going to register as an importer in Mexico, it could import through Supplier's City, but it would have to pay duties as if it was permanently importing the products.  Ruiz says EFTEC accepted permanent payment of the duties, because at the time, Supplier's City's maquila permit was still pending.  Ruiz told EFTEC that under the maquila program, EFTEC would not have to pay the duties at import.

Ruiz also claims it told EFTEC that the empty drums had to be returned to the United States to discount their value, which would occur through customs by a letter supplied by Ford; the letter needed to detail the product Ford received from the supplier; the amount used in assembling a vehicle; the number of vehicles assembled during the time period the product was received; how much of the imported product returned to the United States; and, how much remained in Mexico as part of an assembled vehicle. Ruiz says it told EFTEC that EFTEC had to request the letter, as Ford's authorized supplier, but that the letter should be addressed to Supplier's City.

Not surprisingly, an issue quickly arose regarding payment of the VAT.  In July 2005, one of EFTEC's first test shipments was delayed at the border because the VAT was not paid.  EFTEC says it learned for the first time, as a result of this incident, that

VAT could be assessed to its shipments. The parties resolved this initial issue, then discussed alternative methods to import EFTEC'S products without incurring VAT. While trying to find a long-term solution, EFTEC obtained Ford's agreement to temporarily handle shipment of EFTEC'S products across the border in August and September 2005. In late September 2005, Ford notified EFTEC that its temporary shipments would cease.

In October 2005, while EFTEC was negotiating new arrangements with Ford regarding the VAT, Supplier's City began importing EFTEC's products using Supplier's City's name as the importer of record. Again, this arrangement was not reduced to writing. Supplier's City asserts the arrangement was meant to be temporary, but it continued into late December. During this October through December time period, Supplier's City was assessed VAT taxes of $193,000 for importing EFTEC products into Mexico. Supplier's City says EFTEC refuses to pay this obligation, and Supplier's City cannot afford to do so. Supplier's City says it is subject to substantial interest and penalties, and is at risk of losing its maquila license, because the VAT remains unpaid.

Supplier's City alleges that EFTEC caused the VAT problem, because EFTEC failed to obtain the letter from Ford to exempt EFTEC's products. After repeated requests by Supplier's City and Ruiz, Supplier's City says it tried to obtain the letter from Ford, but Ford would not issue it because Supplier's City was not the authorized supplier.

EFTEC claims that Supplier's City was responsible for obtaining the letter from Ford. EFTEC says Supplier's City promised to take action to eliminate the VAT; it is unclear whether this alleged promise was made during negotiations or after the problem

6

arose.  EFTEC says Supplier's City later changed positions, and on November 30, 2005, notified EFTEC that VAT would be owed on each of EFTEC'S shipments.  As a result, EFTEC elected to re-negotiate its contract price with Ford.

In December 2005, Ford agreed, going forward, to revise the "piece price" (price per item) that it paid for EFTEC products, to include the VAT.  Supplier's City claims that Ford also agreed to back date its purchase orders to reimburse EFTEC for the VAT incurred on prior shipments, including the $193,000 assessed to Supplier's City.  EFTEC denies this; EFTEC says it tried to negotiate with Ford for payment of the past due VAT, but was unable to do so because Supplier's City did not timely provide information regarding the shipment dates and the exact amounts of VAT assessed.  In any event, at some point in late 2005, EFTEC began to wire funds to Ruiz for the VAT payments on each shipment.  Hence, no VAT payments are alleged to be due to Supplier's City after December 23, 2005.

In January 2006, EFTEC, without prior notice, terminated its relationship with Supplier's City and retained ChemLogix for its transportation and warehousing services in Mexico.  EFTEC alleges this was because Supplier's City breached the agreement.  EFTEC contends that in addition to the VAT problem, Supplier's City continually failed to timely return empty magna drums to EFTEC, causing supply chain issues which resulted in additional expense to EFTEC for shifts in production schedules, loss of production time, increased shipping costs for expediting shipments, and payment of overtime wages to employees.  EFTEC also says that delays at the border and at Supplier City's warehouse, resulted in an inability to maintain a product supply at the levels requested by Ford.  EFTEC claims that Ford required it to have a full-time

7

technical services representative in Hermosillo after Supplier's City was terminated.

During the transition period, some product in transit was still delivered to Ruiz and Supplier's City. Thus, Supplier's City and Ruiz had both full and empty magna drums until March or April 2006. EFTEC says it was unaware of the location of some of the product. EFTEC claims that: (1) Ruiz held the product because Supplier's City had not paid its outstanding bill, and (2) Supplier's City failed to notify EFTEC about the location of the product until the day before its expiration date. EFTEC claims the product, valued at $43,232, spoiled as a result of these actions.

Supplier's City denies these allegations. Supplier's City says that when EFTEC terminated the contract, it removed transportation of the product from Supplier's City's responsibilities, and ChemLogix, the new logistics provider, was responsible for locating, collecting, and transporting the product to the new warehouse.

Supplier's City filed suit in the Superior Court of the State of Arizona. EFTEC removed the action to the United States District Court for the District of Arizona, which subsequently transferred venue to this Court. Supplier's City's amended Complaint alleges: Count I - Breach of Express Contract, Count II - Promissory Estoppel, Count III - Breach of Implied Contract/Quantum Meruit, and Count IV - Unjust Enrichment. Supplier's City claims damages in excess of $400,000.

EFTEC filed a Counter-Complaint which alleges: Count I - Breach of Contract, Count II - Promissory/Equitable Estoppel, Count III - Unjust Enrichment, Count IV - Negligent Misrepresentations/Omissions, Count V - Innocent Misrepresentations/Omissions, Count VI - Conversion, and Count VII - Claim and Delivery. EFTEC says it incurred expenses of $140,000 due to Supplier's City's breach

of the agreement.

Supplier's City now moves the Court to: (1) grant summary judgment in its favor on its claim for restitution of the Mexican VAT incurred by Supplier's City while importing EFTEC's products, and (2) dismiss EFTEC's counterclaims.

## III.   STANDARD OF REVIEW

### A.  Summary Judgment

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

The court must view the evidence in the light most favorable to the nonmoving party, and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  The existence of a mere scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Id.* at 250-51.

### B. Motions to Strike

The Sixth Circuit has not prescribed any specific procedure for raising objections to inadmissible evidence at the summary judgment stage. *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 480 (6th Cir. 2008). Rule 56(e) sets the standards which supporting or opposing affidavits to a motion for summary judgment must satisfy, but the rule makes no provision for "striking" documents which may not conform:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed. R. Civ. P. 56(e).

Rule 12 allows the Court on its own motion, or on the motion of a party, to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

## IV. ANALYSIS

### A. Supplier's City's Evidentiary Objections/EFTEC's Motion to Strike

Pursuant to Federal Rules of Civil Procedure 56(e) and 12(f), Supplier's City raises 13 evidentiary objections to portions of the deposition testimony and Exhibits offered by EFTEC in support of its Response to Plaintiff's Motion for Partial Summary Judgment. Supplier's City filed a Reply to EFTEC's Response, but also filed this Motion, urging the Court to strike or decline to consider those portions of EFTEC's Response that are not supported by admissible evidence.

EFTEC says that Supplier's City Objections are a disguised summary judgment

reply brief, submitted solely to avoid E.D. Mich. L.R. 7.1(c)(3)(B)'s five-page limit on reply briefs, and urges the Court to rebuff such "briefing tactics" pursuant to *Phillips v. United Parcel Service, Inc.*, No. 08-13978, 2009 WL 2046126, at *2-3 (E.D. Mich. July 10, 2009); *Auto Indus. Supplier Employee Stock Ownership Plan (ESOP) v. SNAPP Sys., Inc.*, No. 03-74357, 2009 WL 464477, at *1 (E.D. Mich Feb. 23, 2009), and *Welker Bearing Co. v. PHD, Inc.*, No. 06-13345, 2007 WL 1647878, at *1 (E.D. Mich June 4, 2007). EFTEC does not substantively address the Objections.

Supplier's City objected to some of the 61 Exhibits, comprising 754 pages, EFTEC filed in support of its Response to Supplier's City's Motion for Partial Summary Judgment. Some of these objections are sound and supported. Also, this case is distinguishable from the cases EFTEC cites, which it says supports its "briefing tactic" argument. In *Phillips*, the defendant's reply was stricken because it manipulated font sizes and spacing in order to meet the 5-page limit. In *ESOP*, the defendant filed eight separate response briefs to a single motion, aggregating 120 pages, instead of one response and brief. It was not the first time the defendant did this, and the multiple responses were stricken. In *PHD, Inc.*, the plaintiff's two separate motions for partial summary judgment also were stricken. The court found that L.R. 7.1(c)(3)(A) was circumvented because: (1) each brief matched the 20-page limit set forth in the local rule, (2) large portions of the briefs were essentially identical, and (3) the briefs were accompanied by nearly identical sets of exhibits. That is not the case here. While the form of Supplier's City's Motion is uncommon, the Court does not find it to be an "abusive practice." The Court, therefore, will consider each Objection before deciding the Motion for Summary Judgment.

11

**Plaintiff's Objections**

**Objection #1**:  **Greenwald & Reliance on Supplier's City's Representations**

Supplier's City objects to the assertions in EFTEC's Response, that Clive Greenwald contacted Supplier's City as part of his research in preparation for EFTEC to assume responsibility for shipping its products into Mexico for sale to Ford at its Hermosillo plant, and that EFTEC relied on Supplier's City's representations about its expertise and services when it agreed to take over those transportation duties for Ford. Supplier's City says these assertions are contradicted by Greenwald's deposition testimony.

The Court sustains this Objection.  Greenwald testified that he and Wiechart researched the potential costs involved in EFTEC taking over the freight side of the relationship with Ford. *See* Greenwald Dep., p. 36, 38 - 40.  "One of the Stephanies at Ford," referred EFTEC to Supplier's City, between June 2005 and October 2005. *See* Greenwald Dep., p. 45.  At that time, EFTEC had already given Ford several pricing numbers. *See* Greenwald Dep., p. 45.  This was prior to Greenwald's negotiations with Supplier's City and prior to the oral agreement.  Greenwald's testimony, therefore, contradicts the assertion that EFTEC relied on Supplier's City representations about its expertise and services when it agreed to take over transportation duties for Ford.

**Objection #2**: **Huyck, Revnew & Reliance on Supplier's City's Representations**

Supplier's City objects to EFTEC's repeated references to the deposition testimony of Huyck and Revnew, as support for the representations Supplier's City allegedly made to EFTEC regarding its expertise or services beyond warehousing

products.  Supplier's City says Huyck had no involvement in the negotiations and lacks

personal knowledge of any aspect of the negotiations.  Supplier's City also says Huyck

consulted the legal department of EFTEC's parent company, HB Fuller, regarding the

VAT, and obtained its guidance on how the VAT should be handled, and thus did not rely

upon Supplier's City in that regard.

The Court sustains this Objection.  "Personal knowledge . . . is not strictly limited

to activities in which the declarant has personally participated." *Washington Cent. R.R.

Co., Inc. v. National Mediation Bd.*, 830 F.Supp. 1343, 1352-1353 (E.D. Wash. 1993).

Personal knowledge can come from review of the contents of business records, and an

affiant may testify to acts that he did not personally observe but which are described in

business records. *Id.*  Here there are no business records; everything was oral.

Moreover, Huyck testified that Wiechart negotiated the Ford contract. *See* Huyck

Dep., p. 19-20.  Huyck also testified that Greenwald investigated the Mexican warehouse

facility, and Huyck did not know any specifics regarding the investigation. *See* Huyck

Dep., p. 41. Huyck admitted that he did not personally have discussions in which

Supplier's City represented itself as an expert in cross border transportation. *See* Huyck

Dep., p. 63.

Revnew testified he visited Supplier's City's warehouse in the early stages, but

had no involvement in either the Ford bid or the negotiations for the Supplier's City

contract. See Revnew Dep., p. 84.

To the extent EFTEC relies on this testimony to establish that EFTEC relied on

Supplier's City's representations about its services beyond warehousing, the Court

declines to consider it for purposes of the summary judgment motion.

**Objection #3**: Greenwald & Reliance on Supplier's City's Representations

Supplier's City objects to EFTEC's assertions that it relied on Supplier's City's representations that no VAT would be payable on EFTEC's shipments, and that Supplier's City promised to obtain documentation from Ford that would obviate the VAT. Supplier's City says these assertions are not based on personal knowledge; lack foundation; constitute hearsay; and, are contradicted by Greenwald's deposition testimony.

The Court overrules this Objection. Greenwald testified that he learned about the VAT in late July, and advised Huyck to negotiate with Ford to reopen the pricing to add in the VAT. *See* Greenwald Dep., p. 63-64. Greenwald also testified he learned in August or September 2005, that Ford would not give Supplier's City an exemption letter. *See* Greenwald Dep., p. 62-63.

Baker testified that at different time periods, Supplier's City handled temporary and permanent imports for EFTEC; each required a different type of formal justification to avoid payment of the VAT. *See* Baker Dep., p. 39-41. Baker testified that without those letters, EFTEC was fully aware that VAT charges were pending. *See* Baker Dep., p. 41. In Fall 2005, Baker said Greenwald agreed to ask Ford for an extension of Ford's "fiscal deposit" to Supplier's City's warehouse, which would obviate the VAT. *See* Baker Dep., p. 61-62. Baker said that in August 2005, Ford issued a letter, in Spanish, declining to extend the fiscal deposit program to Supplier's City because it was not in Ford's supplier base. *See* Baker Dep., p. 64.

Huyck also testified that he spoke with someone in the tax department of EFTEC's parent company, HB Fuller, to obtain guidance on how the VAT should be

14

handled.  *See* Huyck Dep., p. 87-88.

Thus, it appears that EFTEC was aware, by September 2005 at the latest, that it had to pay the VAT.  However, there is a factual dispute about what EFTEC initially was told about the VAT, particularly in June and July 2005 when the parties were negotiating their oral agreement.  Revnew testified that during a visit with Greenwald to Supplier's City's warehouse in July 2005, Baker indicated no VAT would be due because Supplier's City had maquiladora status. *See* Revnew Dep., p. 66-68.  Baker denied advising Revnew and Greenwald that no taxes would be owed on EFTEC's shipments. *See* Baker Dep., p. 86-87.  Baker also testified he told them that Supplier's City was working on obtaining a maquila permit, and as soon as it got the permit, the extension area of the warehouse would be tax free. *See* Baker Dep., p. 86-87.

To the extent EFTEC asserts it relied on representations made by Supplier's City during negotiations, the evidence presents a question of fact.

**Objection #4**:  **Reliance on Supplier's City Brochure**

Supplier's City objects to the discussion of the Supplier's City brochure that Revnew received during his visit to Supplier's City's warehouse in June 2005, and assertions that EFTEC relied on representations in the brochure about Supplier's City expertise and services in deciding to retain them.  Supplier's City says the brochure was not relevant to EFTEC's decisions, and the assertions are contradicted by Revnew's testimony.

The Court sustains this Objection.  In response to the question, whether anyone ever asked Supplier's City to handle the entire role of the logistics chain to Ford Hermosillo, Revnew testified that Baker presented a brochure which stated Supplier's

City was capable of doing that. *See* Revnew Dep., p. 56. Revnew gave the brochure to Greenwald, who handled the contract negotiations. *Id.* Revnew could not comment on any of those discussions. *Id.*

To the extent EFTEC relies on Revnew's testimony to establish its reliance on the brochure, the Court declines to consider this testimony for purposes of this summary judgment motion.

### Objection #5: Revnew & Reliance on Supplier's City's Representations

Supplier's City objects to references to Revnew's testimony, about conversations with Supplier's City in 2005, to the effect that no VAT would be owed on EFTEC's shipments, as evidence that EFTEC relied upon that understanding in hiring Supplier's City. Supplier's City says this evidence is irrelevant and contradicted by Revnew's testimony.

The Court overrules this Objection. Revnew testified that in July 2005, he was present with Greenwald during a visit to Supplier's City's warehouse. *See* Revnew Dep., p. 66-68. During that visit, which was the initial set up, Baker indicated that no VAT would be due because Supplier's City had maquila status. *Id.* It is unclear whether this was prior or subsequent to, the finalized oral agreement. Revnew said he discussed the VAT with Huyck in January 2006, but had also discussed it with Greenwald "early on" in the project. *See* Revnew Dep., p. 70-71. This evidence is relevant to whether EFTEC relied on representations of Supplier's City regarding the VAT.

### Objection #6: Supplier's City's Alleged Failure to Timely Provide Information re: Past Due VAT

Supplier's City objects to the assertions that EFTEC was unable to respond to

16

Supplier's City's demand for payment of the accrued VAT charges, because Supplier's City failed to provide the necessary background and accounting information to allow EFTEC to determine the tax owed. Supplier's City says these assertions are contradicted by Revnew's testimony. Moreover, Supplier's City says that because it received an 18-month extension for payment of the VAT, the taxes owed on the first shipment were not due until February 25, 2007.

The Court overrules this Objection. Revnew testified that in January 2006, as EFTEC exited the business from Supplier's City, he was responsible for getting an itemized list from Supplier's City with amounts due for the VAT; Huyck asked him to obtain this information in follow-up to documentation previously requested by Greenwald. *See* Revnew Dep., p. 93-94. Revnew says he provided EFTEC's Ford account manager, Bob Pritula, a detailed packet that attached invoices with pedimentos (Mexican custom entry forms), matched to a spreadsheet provided by Baker; the packet was approximately three inches thick and took him two weeks to compile. *See* Revnew Dep., p. 96-97. Revnew recalled the numbers corresponding very closely to what Baker provided. *See* Revnew Dep., p. 97. After Revnew turned over the packet, no one at EFTEC told him they needed more information. *See* Revnew Dep., p. 97.

Huyck testified that on April 20, 2006, Supplier's City employee Enrique Mazon showed up at EFTEC's office with a box of pedimentos and invoices to document what EFTEC owed. *See* Huyck Dep., p. 165-166. Huyck said the documents were provided to EFTEC's accounting department for review and reconciliation. *See* Huyck Dep., p. 166. He could not specifically recall that anything was missing. *See* Huyck Dep., p. 167. Whether Supplier's City timely turned over the documentation to EFTEC, and

whether EFTEC failed or refused to act upon it, present a genuine issue of fact.

**Objection #7**: **Revnew, Exhibit 53 & Expenses Caused By Alleged Breach**

Supplier's City objects to the assertions that EFTEC experienced "shifts in production schedules, loss of production time, increased shipping costs for expediting shipments, and the payment of overtime wages to employees," and citation to Exhibit 53 and Revnew's deposition testimony in support. Supplier's City says that Exhibit 53 has not been properly authenticated, and is inadmissible because it constitutes hearsay. Likewise, Supplier's City says that Revnew's testimony is inadmissible hearsay because its not based on personal knowledge.

The Court sustains this Objection. Documents submitted to support or oppose a summary judgment motion must be attached to an affidavit that both identifies and authenticates each document. *Klein v. Manor Healthcare Corp.*, 2006 U.S. Dist. LEXIS 84836 (6th Cir. 2006). No affidavit is attached to Exhibit 53.

Moreover, Revnew testified that Steve Sabo made statements that EFTEC'S production department did not have magna drums to fill product. *See* Revnew Dep., p. 81-82. Thus, this statement does not appear to be based on Revnew's personal knowledge, *Washington Cent. R.R. Co., Inc., supra,* nor does it establish that the absence of drums was due to Supplier's City's actions.

To the extent EFTEC relies on this testimony to establish that EFTEC incurred damages because of Supplier's City's breach of the agreement, the Court declines to consider it for purposes of the summary judgment motion.

**Objection #8: Ford's Alleged New Requirements After Contract Termination**

Supplier's City objects to the assertions that "Ford required EFTEC to have a

18

technical services representative in Hermasillo full time after Supplier's was terminated," and citation to the deposition testimony of Revnew and Harlan Hanson. Supplier's City says this testimony lacks foundation, and to the extent that it can be presumed that this testimony was based on communications with Ford representatives, is inadmissible hearsay.

The Court overrules this Objection. Revnew testified that he participated in a conference call with Huyck, Pritula, and either Stephanie Learman or Stephanie Howie of Ford Purchasing, in early 2006. During that call, Ford said it wanted an on-site manager due to ongoing issues. *See* Revnew Dep., p. 159-160. A proper foundation was laid for this testimony.

**Objection #9**: **Hanson and Expenses Caused by Alleged Breach**

Supplier's City objects to the assertions that Hanson spent approximately eight weeks at the Ford facility in May, June and July 2005, incurring costs for airline tickets, accommodations, car rentals and meals, and citation to the deposition testimony of Hanson and Exhibit 54. Supplier's City says Hanson's deposition testimony does not specify what expenses, nor the amount, he incurred while working in Mexico. Further, Supplier's City says EFTEC has not provided the proper foundation or authentification for any of the documents in Exhibit 54.

The Court sustains this Objection. No affidavit is attached to Exhibit 54. *Klein, supra.* Moreover, Hanson testified that he spent more time in Mexico in April, May and June to ensure that logistics ran smoothly when EFTEC switched warehouses from Supplier's City to Sonora Porteadores. *See* Hanson Dep., p. 62-63. Hanson also testified that at the request of Revnew, he calculated his hours and expenses while

working on the Sonora Porteadores project. *See* Hanson Dep., p. 119, 123. Hanson used his expense reports and day planner to create a spreadsheet of those figures, but no longer had it because his computer crashed. *See* Hanson Dep., p. 120. Hanson could not independently recall the figures. *Id.*

To the extent EFTEC relies on Exhibit 54 and Hanson's testimony to establish that it incurred extra expenses due to Supplier's City's breach of the agreement, the Court declines to consider it for purposes of the summary judgment motion.

**Objection #10: Revnew & Alleged Spoilation of Product**

Supplier's City objects to the assertions that EFTEC had to "locate its full magna drums," and the citation to Revnew's testimony in support. Supplier's City contends that Revnew testified that he lacked personal knowledge of the facts regarding EFTEC's product spoiling. Supplier's City says the assertion is not supported by admissible evidence.

The Court sustains this Objection. Revnew testified that he recalled product being "held up at the border," towards the end of the relationship. *See* Revnew Dep., p. 131-132. Revnew also testified that during the transition period, some shipments had already left EFTEC destined for Supplier's City's warehouse. *See* Revnew Dep., p. 133. Chemlogix was coordinating transportation of the product from Ruiz to the new warehouse or customs broker. *See* Revnew Dep., p. 132-133.

To the extent EFTEC offers Revnew's testimony to show that Supplier's City's actions caused the product to spoil, the Court declines to consider his testimony for that purpose.

**Objection #11**:  **Huyck & Transition Issues**

Supplier's City objects to the assertions that EFTEC "worked with Supplier's to transfer the product to a new warehouse," and citation to Huyck's deposition testimony to support.  Supplier's City says that Huyck testified regarding the steps EFTEC took to notify Ford that it was changing its logistics provider and warehouse.  Supplier's City says his testimony was not relevant to whether Supplier's City was responsible for the transfer.  Moreover, Supplier's City says that ChemLogix was responsible for transferring EFTEC'S product to the new warehouse, and working with Ruiz to accomplish this task.

The Court sustains this Objection.  While testifying about his handwritten notes on a March 22, 2006 email from Baker to Revnew, Huyck agreed that EFTEC decided to move all of its inventory from the Supplier's City warehouse and the border over to the new warehouse. *See* Huyck Dep., p. 153-154.  There is no indication in this testimony that Supplier's City agreed to assist with this task.

To the extent EFTEC offers this evidence to show that Supplier's City was responsible for transferring EFTEC's product to its new warehouse, and that its failure to do so caused spoilation of EFTEC's product, the Court declines to consider the evidence for that purpose.

**Objection #12**:  **Huyck and Ruiz' Alleged Withholding of Product Upon Contract Termination**

Supplier's City objects to the assertions that "Ruiz was holding the product until Supplier's paid his bills," and citation to the deposition testimony of Huyck in support. Supplier's City says Huyck never testified to that, and the assertion is not supported by

admissible evidence.

The Court sustains this Objection. Huyck testified that ChemLogix worked with Ruiz to move materials during the transition, and there were snags. One issue was that Ruiz claimed Supplier's City owed Ruiz $55,000. *See* Huyck Dep., p. 164-165. There is no indication in Huyck's testimony that Ruiz held the products due to unpaid bills.

To the extent EFTEC offers this testimony to show that EFTEC's product spoiled, because Ruiz withheld the products until Supplier's City paid his bills, the Court declines to consider the evidence for that purpose.

**Objection #13**: **Exhibits 32 and 55 & Alleged Spoilation of Product**

Supplier's City objects to the assertions that "Supplier's City did not notify EFTEC about the product until April 20, 2006, which was the day before the product was to expire," on the ground that they are not supported by Exhibits 32 and 55, the records upon which the assertions are based. Supplier's City says EFTEC has not provided the foundation or authentication necessary for the emails to be admissible, and Exhibit 55 constitutes inadmissible hearsay.

The Court sustains this Objection. No affidavit is attached to Exhibits 32 and 55. *Klein, supra.* Moreover, nothing in the emails identifies them as the first communications between EFTEC and Supplier's City regarding the product expiration date. To the extent EFTEC relies on the emails to establish that fact, the Court declines to consider them for that purpose.

**B. Summary Judgment – Supplier's City's Restitution Claim**

Supplier's City asserts it is entitled to summary judgment on its restitution claims for the VAT it incurred importing EFTEC's products into Mexico. Supplier City says that

because it was not part of the chain of sale, it never would have had any legal liability for the VAT, but for the fact that Supplier's City allowed its name to be used as the importer of record, in order to assist EFTEC with these transactions.

EFTEC counters that Supplier's City failed to plead restitution, and also that the claim fails because Supplier's City still has not paid the VAT. Additionally, EFTEC argues that summary judgment is not proper because genuine issues of material fact exist regarding EFTEC's responsibility for the VAT.

The Court presumes that Supplier's City seeks summary judgment on its claims of promissory estoppel, breach of implied contract and unjust enrichment, all of which were pled in the alternative, in the event the Court found no express contract between the parties.

The Court finds there are numerous issues of material fact which preclude the Court from granting summary judgment. These material facts pertain to the specific contractual terms and the parties' obligations. Just some of the open, material questions are whether: (1) EFTEC was responsible for the costs of border crossing (i.e., VAT, customs brokerage fees, transportation costs); (2) Supplier's City told EFTEC that VAT would not be owed; (3) Supplier's City promised to take action to eliminate the VAT; (4) EFTEC relied on representations made by Supplier's City, regarding Supplier's City's services and the VAT; (5) Supplier's City timely provided information to EFTEC regarding the past due VAT; (6) EFTEC failed or refused to pay Supplier's City's invoices; (7) Supplier's City was required to mitigate damages by paying the VAT; (7) EFTEC or Supplier's City, or neither, breached the oral agreement; (8) the agreement was terminable at will; (9) Supplier's City timely returned the empty magna drums to

EFTEC; (10) the actions of Supplier's City or its agents caused spoilation of EFTEC's product; (11) EFTEC incurred, and is entitled to recover damages, as a result of Supplier's City's actions; and (11) Supplier's City incurred, and is entitled to recover damages, as a result of EFTEC's actions.

The Court **DENIES** the Motion for Summary Judgment.

### C. EFTEC's Counterclaims

Supplier's City says that EFTEC's Counterclaims are unsupportable and must be dismissed.  With regard to the claim for possession of 24 magna drums, Supplier's City says it never exerted dominion or control over any of the empty drums, and that they were always located at Ruiz's warehouse in Nogales, Arizona, ready to be picked up. In fact, Supplier's City says EFTEC retrieved the drums from Ruiz's warehouse after filing its counterclaims.

Regarding EFTEC's claims for expenses related to finding a replacement warehouse and logistics provider, Supplier's City says the asserted damages are not recoverable because the parties' agreement was terminable at will.  Supplier's City says the expenses were incurred as a result of EFTEC's decision to replace Supplier's City.

For the same reasons that summary judgment is inappropriate on Supplier's City's restitution claim, it is inappropriate on EFTEC's counterclaims.

## IV.   CONCLUSION

The Court: (1) **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Objections and Motion to Strike; (2) **DENIES** Defendant's Motion to Strike; and (3) **DENIES** Plaintiff's Motion for Partial Summary Judgment.

**IT IS ORDERED**.

                                        s/Victoria A. Roberts

                                        Victoria A. Roberts

                                        United States District Judge

Dated:  February 10, 2010

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 10, 2010. |
| s/Linda Vertriest |
| Deputy Clerk |